Good morning, and may it please the Court, Craig Singer, appearing for the Carpenters. And if it's possible, I'd like to reserve three minutes of my time for rebuttal. You may do so, Counsel. The clock is in front of you. Just keep an eye on it. Thank you. Your Honors, the complaint in this case alleges a conspiracy by union officials to threaten, intimidate, and take control of the Carpenters Union by a series of illegal acts that are both violent and nonviolent. District Court dismissed the complaint in the pleadings. Can I ask, going in question, because I noticed something last night. The Schieffler case, as I read it, seems to say that taking control is not part of extortion. Is that right? It has to be an effort to obtain property. There has to be property for extortion. And taking control is not it. Taking control of the Carpenters in and of itself is not property, but by taking control of the Carpenters for Hobbs Act purposes, I should say. Right, right. They would be taking money from the Carpenters. Right, but that's it. I mean, a lot of what's in the list in the complaint doesn't seem of things that are called property would not be property for Hobbs Act purposes. That may be right, Your Honor. I think we need to distinguish between Hobbs Act property and business or property for RICO purposes because there is a separate standard for what qualifies as RICO. Right, but first you have to get through the Hobbs Act door. Correct. Okay. Okay, so now. Tell me a little more about the property. It appears to me that dues that Carpenters Union members or former Carpenters Union members have not yet paid to the Carpenters Union cannot be property of the Carpenters Union. Well, I think it. They can be a business expectation of the Carpenters Union, and that's about it. Am I missing something there? It is the property of the Carpenters Union in the sense that they are trying to take money that would be going to the Carpenters Union but not for their. I shop at Fred Meyer's every Saturday, but suppose Safeway starts having better sales and I start shopping at Safeway's, I can see why Fred Meyer's would not be getting the money it expected, but the money that I spent at Safeway was my property, not Fred Meyer's property. Why isn't that analogous? Well, the difference is that when you're spending the money at Fred Meyer's, you're not being extorted to do it. And I think in this situation we can prove that these are Carpenters members. They're existing members or they were members before the conspiracy started. They would be paying dues on a monthly basis. This is what they do. And because of the conspiracy, they are either they have been or they will be moving to different unions and not paying dues to the Carpenters because of an extortion, a conspiracy of extortion. I think that's very different from deciding where to shop. There's also other properties. So you're saying it doesn't actually have to be property owned by the Carpenters Union to be extortion of property? I think if it's property that you have an entitlement to. Well, they don't have an entitlement. If people say I'm quitting the Carpenters Union, I think another union can do better for me. There is no entitlement by the Carpenters Union to the dues, just an expectation. Do you understand the distinction I'm drawing? I certainly do, but under that hypothetical, the person who's leaving the Carpenters Union is doing so of their own free will and not because they're being extorted by a separate action. Suppose they don't of their own free will. Suppose to stretch out my hypo a little less plausibly, the Safeway people are blocking the entrance to Fred Meyer's and making it hard for me to spend my money there and they're keying the cars in the Fred Meyer's parking lot. That would be the use of improper means to get me to spend my money at Safeway, but it's still not Safeway's money until I decide to spend it there. Well, I think if they're doing that in order to stop you from shopping. Of course, and they're doing it by illegal means, but it's still not Safeway's money that I'm taking. They're taking the property that Safeway would be getting and it's a direct interference. And the Hobbs Act covers a business expectation, a tortious interference with business relations. I think it does in that sort of immediate instance that we're hypothesizing. So what's your best case on that point? What's your best case on extortion as defined by losing union membership? I don't have a case for extortion on losing union membership. Well, what's your best case on extortion then? Let me see what I can find. I do want to add, though, that the loss of union members and dues is not the only injury. But it must be your strongest argument because you're leading with it. It's certainly the largest loss in that sense, but we've also directly lost confidential information that was taken from us. We've lost fees. Well, I'm still stuck on a case which would validate the assertion you seem to be making here in open court that the fact that you're losing members under these circumstances is tantamount to extortion. I'm not there yet. Your Honor, I don't have anything to give you other than what we've cited in the briefs, that the notion that property ---- Well, suppose ---- Which case do you have? Suppose it was customers, not members. Do you have a case like that? I don't, Your Honor. Okay. I don't. All right. In any event, we only need to show one property loss in order to have standing here, and we've shown multiple other things. So even if the Court does not accept the notion that union members and dues are property ---- Members can't be property, not since the 13th Amendment. And the dues can't be property until they decide to spend them there. There can be tortious means of depriving the carpenter's union of dues that it otherwise would have received had there not been a tortious interference. But that's not the same as taking property from it. That seems to be what we're all three kind of hung up on. Yeah. Well, I understand the hang-up, and all I can tell you is that this is a very direct interference with property that would have been received. They are taking members away who would have been with the carpenters. It's proximate. It's direct. I will concede that the money is not in the carpenter's pocket at the time it's being taken. And that ---- And there's no assurance that it ever would be. Quite aside from any of this, the members can just go away. Well, but that's a fact issue, Your Honor. And I think you're right. A member could certainly leave by their own volition if they want to. Well, it's not a fact issue because it goes to whether this is in any meaningful sense their property. But we would prove that these are carpenter members who would stay members, who would be paying dues long-term, but for the interference of the extortionate acts. It's a direct cause and effect. It's not some hypothetical maybe we'd get the dues, maybe we wouldn't get the dues. That's a fact question. But we can prove directly that the money would come to us. We've also alleged that we lost confidential information. We've lost money that has been expended by the carpenters for legal fees. We don't need to show that every act alleged in the complaint caused a loss to business or property to recover under RICO. We just need to show that there has been some injury to business or property. But that money, the legal fees didn't go to the carpenters. Legal fees came from the carpenters. I mean, it didn't go to the building trades. The building trades didn't get any legal fees. No, that's true. The legal fees were not paid to the building trades. They were paid out because of. So they didn't obtain any money from the carpenters having to do with legal fees? They did not obtain the legal fees themselves. Right, so that doesn't count. So what are we down to now? We're down to the confidential information, which. They did obtain, yes. But as to that, you have agency issues. Well, I don't think so, Your Honor, because the complaint specifically alleges that the defendant, Mr. Williams in particular, was directly involved in procuring the theft of the confidential information. So I don't think there's an agency issue there. Counsel, the trial judge and I'd leave to amend here. If you were to amend, what would you add? Well, Your Honor, we'd need to understand what the basis for this court's ruling is ultimately before we could make a decision. But we do believe that we have facts that we could amend that would speak to the agency allegations. Well, that's what I'm asking you. What additional facts that are not before us in this record would you add? Well, they're not before you. They're not in the record. And so, you know, I'm not in a position to give you chapter and verse. But I can tell you that we have received documents, including in discovery below, which may very well persuade the Court if the issue, particularly if the issue is agency, if the issue is whether these determinants are true. But what if the issue is what we've been focusing on now? There's nothing you're going to add, right? We – the injuries that we have alleged in the complaint are the injuries that we have alleged. As to obtaining property. What would you add? Yeah. We do not have a particular additional injury to property to add. No, Your Honor. And you never asked to amend. I understand that the case law says you don't necessarily have to. But this is a 250-page complaint and you never asked to amend. Well, we didn't have an opportunity to ask to amend. Well, you could have asked in a motion to reconsider, for example. But you didn't do that. No. And I'm not aware of any obligation that we ask in a motion to reconsider. I mean, we filed an opposition to it. But the consequence of proceeding this way is we're kind of in the air here because we have no clue whether there is any. I mean, ordinarily what would happen is you would say we want to amend. Here's what – here's our proposed amendments. And we don't have that. But the district court didn't give us that opportunity. It's not our fault. I tried to give you the opportunity here and I haven't heard any response yet. It is your fault. I tried to look at the complaint. It's 246 pages. We can affirm on any ground supported by the record. And I'm kind of curious about why we shouldn't affirm under Rule 8. It's not clear and concise. Your Honor, but that's another issue of amendment. I mean, we're being accused, first of all, of not having enough facts. And now we're being accused of having too many facts. Most of the complaint isn't facts at all. It's kind of stump rhetoric. Well, Your Honor, that's something that could certainly be cured by amendment. It's conclusions and stump rhetoric. I don't know if it could. It's piles of facts that don't seem to have anything to do with anything. It's just facts. Well, I mean, I think that there are enough facts in there. But if the court thinks that it's too long of a complaint, that is certainly something an amendment could cure. We have cases where we've affirmed Rule 8 dismissals on the grounds that complaints half this length weren't clear and concise. And the reason is not only the burden on the court, though that counts, but also the burden on counsel for the other side and the people that have to pay counsel on the other side for having to go through it, and more seriously, since there's really no way to comprehend the Rule 246, a 246-page complaint in one lump, both defense counsel and the judge are forced to make their own private outlines of the complaint. And if defense counsel's and the judge's outlines aren't by chance identical, then the defense winds up confronting a secret complaint. They don't even know what you're pleading. Your Honor, I understand the objection, and I think it's something that if the court is concerned about the length of the complaint, we can amend the complaint to shorten it. It's not something that justifies a dismissal with prejudice. It's something that justifies, at the most, a court saying that the complaint is too long, go and amend it. We were never asked to do that. Yeah, but the other side of the equation is you have to give us at least a description of how you would amend it to stay in court. And what we've said in the brief is what I'll try to reiterate here, which is that we've found documents that will show that Mr. Williams, in particular, had a direct connection to the individuals who committed the violent acts. But on this other issue, you don't have anything. And as to the confidential – so we went down to the confidential information and asked for the confidential information. What does – how does that set up a RICO claim by itself? If that's all we had, where's the RICO claim? If there's only one act, then there's not a RICO claim. Okay. So if that's what we had, we don't have a RICO case. Right. But I do believe that the loss of members – we lost members in more ways than – members have been lost through expelling members from the metal trades, which is direct expulsion. When we've lost members by intimidation. Counselor, you're down to less than two minutes. You may wish to reserve. Thank you. I will. Yeah, you may do so. We'll hear from the building trades. Good morning. Leon Diane for the building trades. Let me start by speaking to a couple of the questions that have come up in the council's presentation. We have not – Judge O'Scanlan's question as to what would be added if there were an opportunity, we haven't heard a satisfactory answer. They seem to be hinting that they'd now be able to say who in the union hierarchy would have been using somebody else as an agent to cause violence and scare people away from the carpenter's union. Why shouldn't they get leave to amend to do that? Two things. What the brief says, and it was echoed by counsel, is that they would have evidence tying Defendant Williams to, quote, anti-carpenter's activity. That's what the brief says. The materials that they're referring to don't tie any defendant to violence or vandalism. It's just to, quote, anti-carpenter's activity. And I think it should be undisputed that a substantial part of this campaign, even in the most generous of view, is lawful union competition. One piece of the campaign is that the AFL-CIO adopted Resolution 70, which authorized new carpenters' unions to challenge the plaintiffs here for membership. And competing for members is obviously totally lawful activity. So what we haven't heard is any proffer of what would be pleaded to address the connection to violence or vandalism and the defendants. We've only heard that the defendants had something to do with anti-carpenter's activities. The other thing that I would say is that when Rule 12 was amended in 2007, the Advisory Committee notes states that the amendment allows the plaintiff to re-plead as a matter of right after a motion to dismiss has been filed. Previously, leave to amend had to be sought. And the Advisory Committee note says the right to amend once as a matter of right after service of a motion under Rule 12B. This provision will force the pleader to consider carefully and promptly the wisdom of amending to meet the arguments in the motion. So the plaintiffs saw there was a substantial motion to dismiss. They had plenty of time to apprise the district court of what, in addition to the 244 pages they might add. There was an oral argument before the district court, a lengthy oral argument, where they had every opportunity to say what it was that they might add. And the reality is that the district court has discretion in this area, and he exercised it appropriately by looking at what was before him, which was a very prolix complaint that seemed to unload everything that the carpenters had on the building traits. And if nothing in the 244 pages was going to do it, the judge acted within his discretion in saying, I don't see how anything is going to cure the problems. Are you saying then that they're barred? In other words, we do not have the jurisdiction to allow leave to amend? I was inclined to think that maybe this is a case in which we should at least give them the opportunity to amend, but you're saying that that's barred? Oh, I wouldn't say that it was barred. I would say that if you're looking at what Judge Rice did and whether he abused his discretion in the first instance, the answer is no. Plainly, Judge Rice, had he given them an opportunity to try to cure any defects or fill any gaps, would also have been acting within his discretion. The question for this panel is, did he abuse his discretion based on what he had before him? He did note the general rule, i.e., that you're supposed to. But he said this is unusual because we have 250 pages here. That is right. So he articulated reasons. He showed an awareness of the general rule that leave to amend is freely granted. And he said there's nothing here. Not only did he say there's nothing here. He said, I've seen it. I can't believe there's anything more. I've seen it all and I heard arguments. He said something about the oral argument. I don't remember exactly what he said. I believe he simply said that they had an opportunity to put forward any facts that they might have. Well, hearing from opposing counsel today and giving him the most generous construction in terms of how he would amend, what would your response be? That we haven't heard anything that would solve the critical problem. We've heard nothing that would solve the problems, the multiple problems, I'd like to address those, involving the nonviolent aspect of the campaign. We've heard nothing. What we've heard today for the first time, and it's not in their brief, is a suggestion that there might be evidence to tie the defendants to the violent acts. And what I would say on that is the complaint, where it identifies perpetrators of violence or vandalism, sometimes doesn't identify them. And when it does, the complaint itself pleads itself out of court, so to speak, because it will say X was a local iron worker member. And the law is clear that the building trades, which is a federation, it's way up here, the building trades is a federation, it has affiliates that are local building trades. Those affiliates in turn have affiliates which are the local unions. The complaint never identifies any building trades conduct. It identifies conduct by affiliates of affiliates. It's very far removed. Actually, by members of affiliates of affiliates. And in some instances, members of affiliates. And in a couple of instances, to be fair, they allege that. This is the agency issue, isn't it? That is the agency issue. What about the other issue that we were discussing? Yeah. The question of obtaining property. Well, I mean, on that issue, our point is that where – is that you don't even have to get to obtaining a property because there's no wrongful use of fear. Right. But suppose – but I'd like to know why it isn't easier just to get to the obtaining property. Well, I mean – Because the wrongful use of fear question is at least complicated. I mean, first of all, it requires – we do not have a – of the other circuits that economic pressure isn't wrongful. But we don't have a case on point here. Right? We do have this very recent case that has some broad language. It doesn't deal with the economic use of property, but – and we don't – so I don't understand why the other point isn't much more straightforward. Well, the allegation is that if the carpenters – excuse me, if the building trades – that the building trades are trying to persuade the carpenters to rejoin the building trades, among other things. There's two things going on. Right. They're competing for members, but they're also trying to persuade the carpenters to rejoin. And the argument is that if they rejoined – I mean, I don't – I'd like to make the argument for the other side, but if they rejoined – But as you point out, it hasn't happened. So in terms of – I mean, then we have another problem, which is on that, there's nothing that's happened, so they haven't been injured. That is true. On the first two counts, the A and B counts, there's no conspiracy that – there's no completed act such that the conspiracy doctrine could help the plaintiffs. Because under Beck v. Proupos, under Beck v. Proupos, the Supreme Court made very clear that when 1964C is read together with 1962D and neither is read in isolation, the rule that emerges is the common law rule, which is that conspiracy is not an independent tort. Conspiracy is only a vehicle under 1964C and 62D to expand the universe of potentially liable defendants. So if no one in the universe has completed a wrong, then Beck v. Proupos says that conspiracy doesn't add anything. And I should add that if no one in the universe has completed a wrong that caused an injury, then likewise there can be no use of 1962D to cure that problem. So that's our submission as to the conspiracy counts. On the issue of wrongful use of fear, I would just say that the reasoning of the Third Circuit has been followed by the other courts. And the critical point that the Third Circuit made is that the use of fear of economic loss is a common feature of our free market economic system so that Congress should not likely be inferred to have intended to make a criminal, let alone a serious felony. And a Hobbs Act felony is a 20-year felony. So the Third Circuit says that Congress shouldn't likely be intended to have done that, except in cases where applying economic pressure would result in an independent wrong, such as a personal payoff or an illegitimate transaction, which is a one-sided transaction lacking mutual consideration. So you're referring to a Third Circuit case. I assume that's brokerage concepts. That is brokerage concepts. And our submission is that under the test of brokerage concepts, if all that's being used is economic fear, if that's all that's being used. Economic fear, that would be a tort or a crime or not? Certainly our submission is that. A Third Circuit case doesn't really go to that. A Seventh Circuit case talks about that. If there's a single tort, I'll say this about the Third Circuit case and the Seventh Circuit case, that if the essence of what is being alleged is that economic pressure and only economic pressure is being brought to bear on someone to enter into a bilateral, mutual transaction, then that transaction itself has to be illegitimate or unlawful in some way, and that the addition of a single tort doesn't change the analysis. And I would say this about brokerage concepts. In brokerage concepts itself, the court, after very carefully analyzing the Hobbs Act issue, towards the end of its opinion, addresses a separate claim that the plaintiff had, which was for a Pennsylvania tort of intentional interference with contract. And the Third Circuit in brokerage concepts, after rejecting the Hobbs Act wrongful use of economic fear theory, said that the tort claim could go forward. So the plaintiff's position here that once there's a tort in the context of an economic pressure campaign, that transforms a garden variety tort into a federal 20-year Hobbs Act felony, is refuted by the court's own analysis and what the court did in brokerage concepts. And Judge Berzon is right that the Seventh Circuit said the same thing. In Ronell v. Roe, the court, after rejecting a fear of economic loss theory, went on and said, you know, what the defendant here did may have been harsh, and the defendant may have even committed the tort under Illinois law of bad faith breach of the covenant of good faith and fair dealing. But that's not a federal Hobbs Act violation. Leaving aside the violence, the things that I see, I mean, a bunch of them don't seem to have any, as you say, you know, making a resolution and saying we're going to stand united and so on. But two things that might be wrongful, I suppose. One is the stealing of confidential information, and I gather you would say that's an agency problem primarily. Yeah, and also we would add that there's no allegation in the complaint that that incident, and it is one incident, and as counsel acknowledged, there has to be a pattern. This case can't survive with one incident. So our point on that is really threefold. One is it's a single incident, so if that's all that's left, there's no pattern under any analysis. Second is that under the brokerage concepts test, a single tort, state law tort, wouldn't transform an otherwise proper economic pressure campaign into a federal Hobbs Act violation. But I suppose that could be unlawful, meaning criminal. There's no allegation that it's a criminal act. And our third point, and I think this is actually maybe dispositive and maybe the easiest way to attack this. The third point is the complaint, even if you credit everything about this incident, the complaint does not allege. Remember, the Hobbs Act and the generic test talk about the wrongful use of fear to obtain. So for a tactic to qualify as the wrongful use, it has to be a weapon that the defendant is attempting to use to secure the objective. And the complaint doesn't allege that the defendants went to the carpenters or communicated directly or indirectly. If you don't rejoin us, we will start accepting random, disloyal employees' leaks of confidential membership data. Fairly read, the complaint just says that in the course of this campaign, they happened to find a person in New York, Joanne Lyne, who was willing to give the building trades carpenters' information. There's no allegation that that was the use or that that tort, if it was a tort, was used as any kind of weapon to obtain property. So that is another way of dealing with that one small piece of the complaint. And the other one is the filing frivolous regulatory claims. The filing frivolous regulatory complaint falls under the same agency problems as the violence. If you look at the complaint carefully, every single alleged false or improper regulatory filing was alleged to have been done by a laborer's local or another building trades affiliate local. So you have the same twice-removed problem. There's no allegation that the building trades themselves or Williams. But suppose, just to understand the legal structure here, suppose it wasn't, would that be independently wrongful or would still be simply economic pressure? Our position is that, and there are cases that say the threat to file a lawsuit, even a completely frivolous lawsuit, can't be extortion. And I could give you the sites. One of them is U.S. v. Pendergast, which is an 11th Circuit case. But certainly, even if you attributed to the building trades, which you shouldn't, a threat to institute a frivolous regulatory filing, that is still an effort simply to apply pressure on the carpenters. All right. Thank you very much, Counselor. It's not a recall extortion predicate. Thank you. Thank you, Counselor. Your time has expired. Mr. Singer, you have some reserve time. Thank you, Ron. I'd like to address the Hobbs Act property issue briefly. This is an issue, by the way, that was not briefed in any detail, and so I'm on the fly a little bit here. And if the Court is concerned about this issue, we'd be happy to make additional submissions. But a few things to say about it. First of all, we also represent individual property carpenters whose money is being taken by building trades because they were forced out of the carpenters. That is also a taking of property. There are a number of cases that do say that – I didn't understand what you just said. Some of the plaintiffs in this case are individual carpenters. Some of them have been coerced to join other unions as a result of being forced out of the metal trades, which was part of the conspiracy here. But what is the property that you allege are being taken? Their money, their dues. Their dues. Yes. So the money goes from Charlie Carpenter to Metal Trades Union, and you're saying that's a taking of the carpenters' union's money. But the money didn't come from the carpenters' union. No, Your Honor. It came from Charlie Carpenter. I'm sorry, Your Honor. I'm saying it's a taking of the individual carpenters' money because he is giving his money to the building trades union as opposed to the carpenters' union. But then you have a wrongfulness problem. What's wrong with the building – the metal trades are saying that they don't want the carpenters anymore. What's wrong is the way that they did it. They may be allowed to make that decision unilaterally, but the building trades impose that on them. Can I give you a few sites that I have for the property issue? But that is only economic pressure. It's somebody going and saying, if you're going to deal with us, you can't deal with them. Well, but it's a breach of fiduciary duty in that instance. It's more than just – in the case, in the brokerage concept case, there's no fiduciary duty at issue that the – Breach of fiduciary duty by whom to whom? By the head of the metal trades. The metal trades isn't a defendant. No, but the head of the metal trades is. Mr. Ault is a defendant, and he's part of the conspiracy. And one of the wrongful acts as part of the conspiracy is his breach of fiduciary duty. Can you say a breach of fiduciary duty sets up a RICO case? It certainly can, and it can be a basis for extortion, not by itself. But can I give a few sites? Counsel, are these sites in your brief? They're not because we didn't brief the property issue. Did you provide opposing counsel with a gum sheet listing these sites? The question came up in oral argument for the first time. I'm happy to submit it. All right. Our deputy clerk will help you do that before you leave the courtroom today. Okay. But go ahead. Thank you, Your Honor. Well, we have a site for United States v. Zemeck, 634 F. 2nd, 1159, 9th Circuit case. And then the Smithfield Fruits case, which actually is cited in our brief, although for other propositions, cites a number of cases at page 224 for the proposition that the right to do business free of coercion and extortion is a protected property right under the Hobbs Act. Thank you, Counsel. Your time has expired. The case just argued will be submitted for decision.
judges: O'scannlain, Kleinfeld, Berzon